UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                                      Chapter 7

Myint Kyaw a/k/a Jeffrey Wu,                                    820-72407-REG

                                          Debtor.
-----------------------------------------------------------x

**DECLARATION IN SUPPORT OF MEZZANINE LENDER'S OMNIBUS MOTION SEEKING THE FOLLOWING ALTERNATE RELIEF: (i) RECONSIDERATION OF THE CONVERSION ORDER PURSUANT TO FEDERAL RULES 59 AND 60(b) AND LOCAL RULE 9023-1; (ii) RECONVERSION OF THE CHAPTER 7 CASE BACK TO CHAPTER 11 REPLETE WITH THE RE-ESTABLISHMENT OF THE OPERATING TRUSTEE PURSUANT TO 11 U.S.C. SECTION 706(b); OR (iii) ALTERNATIVELY GRANTING A STAY PENDING APPEAL**

Kevin J. Nash declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

1.    I am a member of the law firm of Goldberg Weprin Finkel Goldstein LLP, counsel for Landmark Portfolio Mezz LLC (the "Mezz Lender"), the holder of a substantial pre-petition claim against the individual Chapter 11 debtor, Myint J. Kyaw a/k/a Jeffrey Wu (the "Debtor") currently in excess of twenty four ($24,000,000) million dollars.

2.    I have represented the Mezz Lender since the inception of the Debtor's Chapter 11 case on July 8, 2020. I have been involved in virtually every aspect of the reorganization process, working closely with the Debtor, his counsel, Lori Lapin Jones as Operating Trustee (the "Operating Trustee"), and her counsel, as well as various other creditors, including the senior lender, 41-60 Main Street LLC and its affiliates ("Madison"). As such I am fully familiar with the facts and circumstances set forth herein.

3.    I respectfully submit this Declaration in support of the Mezz Lender's Omnibus Motion seeking alternate relief as follows: (a) an Order pursuant to Federal Rules 59 and 60(b),

and Local Rule 9023-1, reconsidering and vacating this Court's order of July 6, 2022 converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code [ECF No. 456] (the "Conversion Order") so the Debtor can proceed with his Amended Plan as defined below; or, alternatively, (b) an order re-converting the bankruptcy case from Chapter 7 back to Chapter 11 of the Bankruptcy Code pursuant to 11 U.S.C. §706(b), replete with re-establishing the appointment of the Operating Trustee; or, alternatively, (c) granting a stay pending appeal from the Conversion Order pursuant to Bankruptcy Rule 8007.

4.     This Omnibus Motion is filed from a creditor's perspective, and the Mezz Lender anticipates other creditors will join as well. The Debtor is also moving for similar relief and the Mezz Lender requests that the applications be heard simultaneously.

## Background

5.     Not to be melodramatic, but the Conversion Order, a copy of which is annexed hereto as Exhibit "A", is likely a death-knell to the significant interests of creditors whose claims as compromised total approximately $150 million. First, conversion will invariably result in a protracted bankruptcy proceeding which could last for several more years at exponentially higher administrative costs, including increased professional fees, accounting fees, brokers, consultants, and commissions. Second, conversion will further complicate an already complex tax structure and will impose literally tens of millions of dollars of unnecessary capital gains tax obligations upon the bankruptcy estate. Third, conversion will create a feeding frenzy among creditors who will be pitted against each other, creating the prospect of dozens of collateral litigations. Fourth, conversion will result in the liquidation of assets in a distressed environment undercutting creditors' ability to realize going concern value. Fifth, and, perhaps, most importantly,

conversion runs directly counter to the superseding agreements reached with the Debtor by a dozen or more creditors and embodied in the Debtor's amended plan, as discussed below.

6. In view of these dire consequences, the Conversion Order must be reconsidered and vacated to prevent manifest injustice resulting from the creditors' inability to even obtain a hearing (which is a vital component of due process) to consider the Amended Plan. In bankruptcy, taking action in the "best interests of creditors" is a dominant theme under both Sections 1112(b) and 1129(a). Therefore, the fact that creditors have already consented to the Amended Plan should be given paramount consideration regarding the final disposition of the Debtor's Chapter 11 case. More than $150 million of duly negotiated debt literally hangs in the balance.

7. Most disheartening, however, is that the creditors, *en masse*, worked tirelessly since June 16, 2022 to develop a new exit strategy as memorialized in the Debtor's amended plan, filed on July 6, 2022 [ECF No. 452] predicated upon a number of revised stipulations (the "Amended Plan"). The Amended Plan has received unanimous written consent from all the major creditors and was on the verge of gaining the Operating Trustee's support as well when the decision to convert came down during the early afternoon of July 6, 2022.

8. The Mezz Lender accommodated multiple interests in reformulating a supplemental settlement that became a critical part of the Amended Plan. This revised settlement provided important concessions to both the Debtor and the Operating Trustee in forsaking a cash dividend in favor of a one-year $21 million deferred note, collateralized principally by a series of confessions of judgment pending recognition of a potential pledge and security interest. The Mezz Lender subordinated its rights to the interests of the Operating Trustee and the bankruptcy estate by agreeing to an unmistakable carve-out allowing for the sale

of REIT shares to pay all potential federal and state income taxes owed by the bankruptcy estate. The Mezz Lender incorporated myriad comments from the Operating Trustee during the lead up to the filing of the Amended Plan on July 6, 2022 to eliminate all possible tax exposure. I fully expected to receive the formal support of the Operating Trustee.

9. Besides the Mezz Lender, the Amended Plan also gained the unanimous support of every other major creditor in the bankruptcy case without exception. The Amended Plan came into being to address the roadblocks presented by the inability of the Exit Lenders[1] to obtain full recognition of a required pledge and security interest covering the Debtor's interest in the REIT [GTJ Realty LP, held by the Debtor through VWU 888, LLC].

10. After the June 16, 2022 hearing, the creditors quickly came to the conclusion that waiting (or hoping) for approval from the REIT and its lenders had reached a dead end. Vigorous new action was required. In many respects, the Amended Plan is a testament to the ingenuity of the creditor body as a whole, which rallied with the Debtor to develop necessary modifications regarding the disposition and treatment of claims over the next year based on the future sales and re-financings of real estate assets in conjunction with an orderly disposition of some of the Debtor's REIT shares without conditions or contingencies. A copy of the Amended Plan is annexed hereto as Exhibit "B" for the Court's ready reference.

11. Despite these efforts, the Court entered the Conversion Order without further hearing even though conversion is completely anathema to the overall interests of creditors. Moreover, the Court made no specific finding of "cause" for purposes of 11 U.S.C. § 1112(b) except reference to the fact that the Debtor was unable to complete the anticipated exit financing prior to July 6, 2022. While an inability to confirm a plan of reorganization can be grounds for

---

[1] Invictus Real Estate Partners LLC, Fortress Investment Group and Madison.

4

conversion, the Debtor and creditors should not be pigeonholed into a single plan structure – on an all or nothing basis – without any ability to file amendments to replace the elusive exit financing. To be sure, the Court gave clear warning on June 16, 2022 that conversion was imminent, but there was no indication that the Court would not consider other alternatives. Creditors certainly appreciated the July 6, 2022 deadline and worked tirelessly to formulate a viable and confirmable alternative in the form of the Amended Plan. The Debtor received authorization from the REIT to immediately sell approximately 1.0 million REIT shares to generate the cash funds needed for confirmation.

12. Notably, outside of the inability to obtain approvals from the REIT's lender, the underwriting for the exit financing was in place, and indeed, the Debtor's estate, directly or indirectly, owns or controls more than $200 million in assets, consisting of condominium and other real estate holdings in Deer Park, New York, and Queens, worth $150 million or more, as well as a residual balance of some 3.6 million shares in the REIT (after the initial liquidation of 1.0 million shares) having a conservative value of at least $55 million based on a share price of least $14.50 per share.

13. In proposing and filing the Amended Plan which the Mezz Lender formally joined as a co-proponent [ECF No. 453], the parties were hopeful that the Court would at least set down the Amended Plan for a hearing. Throughout the case, the Court appeared duly impressed with the fact that the Debtor's portfolio of assets supported underwriting for a $170 million exit facility. Obviously, third party lenders saw great value in the Debtor's assets, which the creditors decided to marshal for themselves under the Amended Plan.

14. Yet, the Court entered the Conversion Order even before the 5:00 p.m. deadline on July 6, 2022 expired, effectively nullifying intense negotiations by a dozen or more parties

designed to allow creditors to control their own destiny. The decision to convert led to very difficult conversations with creditors, who face dire economic consequences of their own. Make no mistake about it, the Court's decision to convert has created great turmoil for creditors without even the opportunity for a hearing on the Amended Plan.

15. In the Mezz Lender's view, the reorganization process cannot end on this note, particularly since no creditor or other party in interest actually moved for conversion, and the Court effectively acted on its own. While the Court has the power to do so under 11 U.S.C. §105, such power should be used sparingly and should not be invoked to override the unanimous consent of creditors. Fundamental principles of due process demand nothing less than reconsideration and a fulsome hearing on the Amended Plan.

## Legal Argument

### A. The Court Should Reconsider and Vacate The Conversion Order

16. While the standard for reconsideration is a strict one, this case presents a proper basis to vacate the Conversion Order so as to give creditors a fair opportunity to attempt to confirm the Amended Plan. Both the Federal Rules and the Local Court Rules allow for reconsideration. Specifically, a judgment and order may be reconsidered under Rules 59 and 60(b), and Local Rule 9023-1. "To succeed on a motion to reconsider, the moving party must demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision.' " *In re Big Apple Energy, LLC*, 2022 WL 997284, at *4 (Bankr. E.D.N.Y. Apr. 1, 2022) (*quoting In re Taub*, 421 B.R. 93, 101 (Bankr. E.D.N.Y. 2009). *See, also Banco Cent. Del Paraguay v. Paraguay Humanitarian Found., Inc.,* 2007 WL 2493684 (S.D.N.Y. Sept. 5, 2007).

17. Under Federal Rule 60(b)(6), the Court may reconsider the Conversion Order for any "reason that justifies relief". *See, Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986) (Rule 60(b)(6) "provides that relief may be granted for 'any other reason justifying relief from the operation of the judgment.' This portion of the Rule is properly invoked only when there are extraordinary circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)–(5) of the Rule.") (internal citations omitted).

18. No one is suggesting for a moment that the Court lacked a clear grasp of the complexities of this case or failed to demonstrate patience and due restraint throughout the proceedings, initially appointing an Examiner and then Operating Trustee as alternatives to conversion earlier in the case when the prospect of exit financing was still in its infancy. Moreover, the Court approached the issue of conversion with a clear understanding of the implications to creditors, and often times noted the parade of horribles that lay ahead.

19. That is why creditors attempted to take their destiny into their own hands by agreeing to the Amended Plan (without exit financing), which was filed within the July 6, 2022 deadline and represents a significant new factual development that was not given sufficient consideration by the Court.

20. Reconsideration is the proper vehicle to correct the situation, and allow creditors to exhaust all possible alternatives short of conversion.

21. Fundamentally, the decision to convert or dismiss a proceeding must be based on "cause" under 11 U.S.C. §1112(b), and if cause is found, the Court then considers whether conversion or dismissal is in the "best interests of creditors of the estate". *See, e.g. In re Adamo*, 2016 WL 859349, at *9 (Bankr. E.D.N.Y. Mar. 4, 2016).

22. Even if cause if found, the Court still retains the power not to convert or dismiss the Chapter 11 case based upon unusual circumstances (not extraordinary circumstances) if the requested dismissal or conversion is not in the best interest of creditors and the estate. *See, e.g., In re Keeley & Grabanski Land P'ship*, 460 B.R. 520, 536 (Bankr. D.N.D. 2011) ("the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding."). To this effect, Section 1112(b)(2) provides as follows:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> **(A)** there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
> **(B)** the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--
> **(i)** for which there exists a reasonable justification for the act or omission; and
> **(ii)** that will be cured within a reasonable period of time fixed by the court.

23. Any decision to convert must be predicated upon a clear showing of cause as enumerated under Section 1112(b). This provides a non-exhaustive but highly developed list of grounds supporting conversion, none of which exist here, or were cited by the Court in the Conversion Order. In fact, with an Operating Trustee in place, none of the traditional grounds of mounting losses, mismanagement or failure to comply with reporting requirements are present except perhaps the failure to confirm the Debtor's first plan, under Section 1112(b)(4)(J).

24. However, the Debtor, in fact, filed the Amended Plan within the Court's deadline of July 6, 2022. Most importantly, the Amended Plan eliminated the need for exit financing and implements discounted pay-outs based upon the liquidation of assets in a controlled and reasonable manner that will maximize the return to creditors.

25. Given the stakes involved, the Court should exercise its discretion to permit a new confirmation process to move forward with respect to the Amended Plan unbridled by the difficulties in completing the exit financing. Conversion may yet be imposed, but it is simply not warranted at this stage where everyone is working cooperatively and expeditiously to achieve a result that will benefit all stakeholders and has been accepted by all creditors. In fact, given the existing consents and funding, the Amended Plan can literally be heard and confirmed by the end of July.

26. This Court addressed a similar situation in *In re FMO Assocs. II, LLC*, 402 B.R. 546 (Bankr. E.D.N.Y. 2009), where a Chapter 7 debtor sought to convert to Chapter 11 file a liquidating plan, and was opposed by the Chapter 7 Trustee. As this Court noted:

> In this case, it is conceded that the sale of the Property, which is the Debtor's most valuable asset, will proceed more quickly and perhaps less expensively if it takes place in Chapter 11. These facts, taken together with the U.S. Trustee's assertion that it is in the best interest of the creditors of this case to grant the Motion, undercut the Trustee's argument. The purposes of the Debtor and the creditors will best be served by converting the case to Chapter 11.

27. Similarly, here, all creditors are unanimous in their assessment that returning to Chapter 11 is the best path forward. The voices of creditors should be given expression by reconsideration of the Conversion Order.

### B. The Case Should Be Re-Converted Under Section 706(b)

28. Even without reconsideration, re-conversion to Chapter 11 is also permissible under Section 706(b), and would also provide an opportunity to save the Amended Plan. Section

706(b) permits the Court to convert a Chapter 7 case to Chapter 11 at any time upon the request of a party in interest. While there is little case law on re-conversion, the considerations to be made under Section 706(b) generally were laid out in *In re Home Network Builders, Inc.*, 2006 WL 3419791, at *3 (D.N.J. Nov. 22, 2006 and center upon "benefit" to all parties, with the decision left to the sound discretion of the Court.

> Pursuant to the plain language and the legislative history of § 706(b), it is clear that decisions involving conversion are left in the sound discretion of the Bankruptcy Court. The plain language of § 706(b) specifically states that the Bankruptcy Court "may" convert a Chapter 7 case to a Chapter 11 case, as opposed to "shall", indicating that conversion is in the bankruptcy court's discretion. This comports with the legislative history of § 706(b), which offers that "[t]he decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest." H.R.Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. at 94 (1978).
>
> In determining whether conversion from Chapter 7 to Chapter 11 under § 706(b) will most inure to the benefit of all parties in interest, including both creditors and debtors, courts consider the factors in § 1112(b) . . . because if cause exists to reconvert from Chapter 11 under § 1112(b), conversion from Chapter 7 under § 706(b) would be a futile and wasted act.

29. Given the interrelationship between Sections 1112(b) and 706(b), the agreement of creditors presents a compelling basis for re-conversion so that the Debtor and its creditors can pursue confirmation of the Amended Plan. Given the active participation and support of all of the major creditors with respect to the Amended Plan, re-conversion would certainly not be a futile effort and would provide every stakeholder with substantial benefits that they cannot achieve in Chapter 7. As with reconsideration, re-conversion to Chapter 11 must be considered from the viewpoint of what is in the best interest of creditors.

### C. Alternatively, a Stay Should be Imposed Pending Appeal

30. Should the Court deny any opportunity to pursue the Amended Plan, creditors will obviously appeal that decision, and hereby request a stay pending appeal pursuant to

Bankruptcy Rule 8007. Generally the request for a stay is made before the Bankruptcy Court prior to proceeding in the District Court.

31.     The Supreme Court has set down a clear set of guidelines for determining whether to grant a stay of an interlocutory appeal, explaining:

> A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case. The traditional stay factors contemplate individualized judgments in each case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion . . .
>
> A motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles . . . those legal principles have been distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 433-34, 129 S. Ct. 1749, 1760-61 (2009)(citations and internal quotation marks omitted).

32.     The Mezz Lender submits that all four elements are met here. The first factor, a strong showing of the likelihood of success on the merits exists even though the Court previously ordered conversion. Indeed, the lack of clear cause combined with the procedural posture of the case in the wake of the Amended Plan gives rise to important issues to be considered on appeal. For purposes of considering a stay, a list of indicators has been developed to assist courts, including: (i) the standard of review; (ii) whether the issues involve an unsettled area of law; (iii) whether the issues are difficult or thorny; (iv) whether questions of constitutionality are raised; and (v) the extent to which the court relied upon precedent. *See*, *Local 1303-362 of Council 4 v. KGI Bridgeport Co.*, 2014 WL 555355 (D.Ct. 2014)(collecting cases).

33. Here, the Court converted the case without any consideration of the Amended Plan, let alone scheduling a hearing for the creditors to be heard and weigh-in concerning their positions relating to the confirmability of the Amended Plan. No legal authority is cited in the Conversion Order as to why the Court declined to conduct a hearing on the Amended Plan. The Mezz Lender submits that, given the overriding principle that conversion should be invoked based upon the interests of creditors, there is a strong basis for reversal.

34. The second and third factors are easily shown, as the Mezz Lender, along with other creditors, will be subjected to irreparable harm and will forfeit the opportunity receive a meaningful opportunity to receive timely distributions in negotiated amounts, and will be subjected to a host of negative consequences resulting from a Chapter 7 liquidation.

35. As noted above, under the Amended Plan, creditors have established the framework for controlled sales of interests to maximize values and limit tax consequences, all of which will be lost in Chapter 7. Moreover, there are substantial additional delays and increased administrative costs associated with Chapter 7 that can be avoided if the case goes forward in Chapter 11 and the Amended Plan is confirmed.

36. Finally, the fourth factor, the public interest, is met because the stay will promote the rights of creditors, while maintaining the status quo through continuation of the Operating Trustee.

### D.  Need for an Expedited Hearing

37. This matter is obviously time sensitive, and the Mezz Lender requests a hearing on the proposed Motion at the earliest possible time convenient to the Court, consistent with due process. Service of the Motion can be made on an expedited basis, largely through the use of email.

WHEREFORE, the Mezz Lender respectfully prays for the granting of relief consistent with the foregoing.

Dated: July 7, 2022

/s/ Kevin J. Nash, Esq.

Goldberg Weprin Finkel Goldstein, LLP
Attorneys for the Mezz Lender
1501 Broadway – 22nd Floor
New York, New York 10036
(212) 221-5700
kjnash@gwulaw.com